# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

STANLEY J. CARTER                                          PETITIONER
ADC #111939

V.                                NO. 5:17-CV-00069-JTR

WENDY KELLEY, Director,
Arkansas Department of Correction                         RESPONDENT

## MEMORANDUM OPINION

Pending before the Court[1] is a 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus filed by Stanley Carter ("Carter"), an inmate in the Arkansas Department of Correction ("ADC"). *Doc. 2.* Before addressing Carter's habeas claims, the Court will review the procedural history of the case in state court.

## I. Background

On July 24, 2013, a Crittenden County jury convicted Carter on three separate counts of rape. Trial Transcript, *Doc. 13-6 at 82.* The victims of those rapes were three children: "As.L. (age nine); An.L. (age eight); and S.H. (age six)." On September 16, 2013, Carter received a life sentence for raping As.L. and two 50-

---

[1] The parties have consented to proceeding before a United States Magistrate Judge. *Doc. 14.*

year sentences for raping An.L. and S.H. The Sentencing Order specified that the sentences were imposed consecutively.[2] *Doc. 13-2 at 83-85*.

In his direct appeal, Carter's only argument was that the trial court erred in denying his motion to dismiss based on a violation of Rule 28.1 of the Arkansas Rules of Criminal Procedure ("the Arkansas speedy trial rule"). *Carter v. State*, 2016 Ark. 152, at 4-5, 484 S.W.3d 673, 675-676 (*Carter I*). On April 7, 2016, the Arkansas Supreme Court concluded that the Arkansas speedy trial rule was not violated and affirmed Carter's conviction.[3]

On April 14, 2016, Carter received a letter from his appeal counsel, Lee Short,[4] enclosing a copy of the Court's decision in *Carter I. Doc. 8 at 28*. In his letter to Carter, Mr. Short stated the following:

---

[2] During Carter's sentencing, the trial judge stated: "So on the count involving [As.L.], you have life . . . On each of the other two counts, I'm sentencing you to 50 years. Those 50 years run consecutive with one another and concurrent with life." *Doc. 13-5 at 21*. However, Carter's Sentencing Order states that all three sentences run consecutive to each another. *Doc. 13-2 at 83-85*. This apparent scrivener's error is of little practical significance given Carter's life sentence, which in Arkansas means life, without the possibility of parole, unless the Governor grants clemency and commutes Carter's sentence to a term of years. *See Hobbs v. Turner*, 2014 Ark. 19, 7, 431 S.W.3d 283, 287 (2014).

[3] While acknowledging that the trial court erred in its speedy trial calculation, the Court found other excludable time the trial court had *not* considered. When that additional time was properly included in the correct calculation, the Court held there was no violation of the Arkansas speedy trial rule. *Carter I,* 2016 Ark. 152, at 4-5, 484 S.W.3d at 675-676.

[4] Carter's trial counsel was Shaun Hair ("Mr. Hair"). After he had difficulty filing a submissible Appellant's Brief on behalf of Carter, the Arkansas Supreme Court relieved him as appellate counsel, ordered rebriefing, and appointed Mr. Short to represent Carter in his direct appeal. *See Carter v. State*, 2015 Ark. 259, at 2.

> . . . I do not believe [the Arkansas Supreme Court is] correct factually or legally; *therefore, I will file a petition for rehearing*. The State will respond. The Court will likely issue a decision on that petition in approximately two months. I will notify you as soon as a decision is reached.
>
> If we are unsuccessful in this appeal, then you will have 60 days to file a petition alleging ineffective assistance of counsel with the Crittenden County Circuit Court. The petition must conform to Arkansas Rule of Criminal Procedure 37. You should list anything you believe your trial counsel did incorrectly or failed to do that could have produced a different result.

*Id*. (emphasis added).

According to Carter, this letter was the last time he heard from Mr. Short. *Doc. 8 at 2-3*. Two months after receiving Mr. Short's letter, Carter wrote the Office of the Criminal Justice Coordinator for the Arkansas Supreme Court "concerning the overall status of his direct appeal." *Doc. 8 at 2-3*. In a letter, dated July 7, 2016, the Justice Coordinator for the Court advised Carter that:

> There was no petition for rehearing filed[.] The judgment was affirmed on April 7, 2016. The final mandate was issued on April 26, 2016. The case is considered closed in the Arkansas Supreme Court.

*See* Letter from Criminal Justice Coordinator to Carter, *Doc. 8 at 30*.

Arkansas law required Carter to file a Rule 37 petition within sixty days of the date the Arkansas Supreme Court issued its mandate affirming his convictions on direct appeal. Ark. R. Crim. P. 37.2(c)(ii). Because day sixty fell on Saturday, June 25, 2016, Carter was required to file a Rule 37 Petition on or before Monday,

June 27, 2016. Ark. R. Crim. P. 1.4. It is undisputed that Carter never filed a Rule 37 Petition.[5] As a result, none of the ineffective assistance of counsel claims he now seeks to assert in this action were ever raised and exhausted in a Rule 37 proceeding.

## II. Discussion

On March 20, 2017, Carter initiated this § 2254 habeas action and asserted the following claims:

> Claim 1: His trial counsel, Mr. Hair, provided ineffective assistance of counsel by failing to adequately interview, subpoena, and call defense witnesses. *Doc. 8 at 17*.

> Claim 2: Mr. Hair provided ineffective assistance of counsel by failing to request a continuance or otherwise object to the Amended Criminal Information filed on the day before his trial began. *Doc. 8 at 17-18*.

> Claim 3: Mr. Hair provided ineffective assistance of counsel by failing to timely inform Carter of allegedly "exonerating DNA evidence" and failing to seek independent experts to review the DNA evidence. *Doc. 8 at 16-17*.

---

[5] By the time Carter received the Justice Coordinator's July 7, 2016 letter notifying him that Mr. Short had *not* filed a Petition for Rehearing, the mandate had issued, the appeal was final, and it was too late for Carter to file a timely Rule 37 Petition.

The Arkansas Supreme Court has made it clear that "no provision in [Rule 37] . . . permits a petitioner to file his petition outside the time limits set by the Rule on the ground that he was not informed of the affirmance of the judgment on direct appeal." *Sanders v. State*, 2015 Ark. 249, at 2, 2015 WL 3429115 (2015). *Accord*: *Ward v. State*, 2016, 479 S.W.3d 9, 2016 Ark. 8 ("The time limitations imposed in the postconviction relief rule are jurisdictional in nature, and, if they are not met, a trial court lacks jurisdiction to grant postconviction relief.").

Claim 4: Mr. Hair provided ineffective assistance of counsel on direct appeal, by failing to argue the evidence was insufficient to support his rape convictions. *Doc. 8 at 18-19.*[6]

Claim 5: Carter's convictions "should be dismissed . . . because the [t]rial [c]ourt did not follow the strict commands of Arkansas Rule of Criminal Procedure 28.3(b)(1)." *Doc. 2 at 2*; *Doc. 8 at 8-16.*

Claim 6: Carter's convictions violated his Sixth Amendment right to a speedy trial, as applied to his state court trial under the Fourteenth Amendment's Due Process Clause. *Doc. 2 at 4*; *Doc. 16 at 1-5.*

Respondent argues that Carter procedurally defaulted Claims 1 through 4 and Claim 6, *and* all five of those claims also are without merit. As to Claim 5, Respondent argues it raises an error of *state law* that is not cognizable under § 2254. *Doc. 13.*

Carter argues that: (1) his habeas claims have merit; and (2) Mr. Short's April 14, 2016 letter lulled him into believing Mr. Short had filed the Petition for Rehearing, and, under the "cause and prejudice" or "actual innocence" exceptions, the Court should excuse his procedural default and reach the merits of his claims.[7]

---

[6] In rebriefing the direct appeal, Mr. Short also did not challenge the sufficiency of the evidence. Carter does *not* allege the *same decision* by Mr. Short also constituted ineffective assistance of counsel.

[7] When a petitioner fails to fully exhaust his claims in state court and the time for doing so has expired, his claims are procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). When a procedural default occurs, federal habeas review of the claim is barred unless the habeas petitioner can show "cause" for the default and "actual prejudice" resulting from the constitutional violation, or demonstrates that the failure to consider his claim will result in a "fundamental miscarriage of justice." *Id.*, 501 U.S. at 750.

For the reasons explained below, the Court concludes that all of Carter's habeas clams must be dismissed, with prejudice.

## A. Underlying Evidence Supporting Carter's Rape Convictions

In 2012, nine-year-old As.L., eight-year-old An.L., and six-year-old S.H., lived with their grandmother, Samantha Smith, in a residence located at 724 South 10th Street, West Memphis, Arkansas.[8] Carter also resided at that address. *Doc. 8 at 20*.

On the morning of May 24, 2012, the last day of school, a parent of another child told the principal of Wonder Elementary School that As.L. and An.L. said they were being sexually abused. *Doc. 13-4 at 20-23*. The principal reported the alleged abuse to Dionne Harris ("Ms. Harris"), a counselor at Wonder Elementary School, who immediately interviewed As.L. and An.L. *Id. at 25*.[9] Ms. Harris then called the child-abuse hotline and reported the sexual abuse. *Id. at 26-28*.

At 3:15 p.m. on May 24, 2012, Detective Michelle Sammis and Detective Yvonne Peeler, with the West Memphis Police Department, went to 724 South 10th Street to investigate the allegations of sexual abuse. Trial Testimony of Detective Sammis and Detective Peeler, *Id. at 35-36, 136*. When they arrived, As.L., An.L.,

---

[8] As.L. and An.L. are sisters, and S.H. is their cousin. *Doc. 13-4 at 88-89*. Carter was the only male living in the house during the relevant time period. *Id. at 103*.

[9] Ms. Harris did not interview S.H. because she did not go to school on May 24, 2012. *Doc. 13-4 at 23*.

and S.H., were sitting on the front porch. *Id. at 36*. The detectives introduced themselves and began talking to the girls. *Id.* They conversed with the detectives and did not seem afraid or intimidated. *Id. at 137*. After a few minutes, Carter came outside. All three girls immediately stopped talking. *Id. at 36 and 137*.

Detective Sammis told Carter they need to speak with him, and he agreed to ride with the detectives to the police station for an interview. *Doc. 13-4 at 36, 38*. At the station, Carter signed a consent form agreeing to provide saliva samples for DNA testing. However, he exercised his right to a lawyer and declined to be interviewed. *Id. at 38-40*. Detective Sammis took swabs of Carter's right and left cheek for DNA testing. *Id. at 41-42*.

Later the same afternoon, Detective Peeler transported As.L., An.L., and S.H. to the Rape Crisis Center in Memphis, Tennessee. *Id. at 139*. There, Dr. Amanda Taylor took each child's medical history, including a narrative of the alleged abuse, and conducted physical examinations of each child. Dr. Taylor's Trial Testimony, *Id. at 119-135*.[10]

During As.L.'s interview, she told Dr. Taylor:

> . . . Stan grabbed me by my leg, and pulled me in a room. He put lotion on my middle part. He tell me if I screamed he was going to abuse me. He put his middle part in my butt, and I ran to the door, and he locked it. He made me put my mouth on his

---

[10] Dr. Taylor has a doctorate in Nursing Practice with a specialty in forensics. *Doc. 13-4 at 116-117*. She obtained consent to examine the girls from their grandmother, Samantha Smith. *Id. at 121*.

> middle part. White stuff came out, and I tried to go away but
> he held my head and made me swallow the stuff.

*Id. at 126.*

During As.L.'s physical examination, Dr. Taylor noted, "in [As.L.'s] genital area, she had a light pink thickened area like basically scar tissue at 11 to 12 o'clock[.]" *Id. at 127*. Dr. Taylor could not say what caused the injury but found the injury to be consistent with penetration by "something." *Id. at 128*.[11] Because Dr. Taylor could not determine how recently As.L. had sexual contact with Carter, she did not collect a rape kit. *Id. at 126*.

Dr. Taylor then interviewed S.H., who told her:

> Somebody called the police because Stan put lotion in this . . .
> pointing to her vaginal area . . . and put his middle part there.
> Clarified middle part as his penis. He asked did it hurt, and I
> said yes, and he kept doing it. He made me suck his middle
> part. White lotion came out of the hole. He told me to stop, and
> he went to the restroom, and used a towel. He does it to my
> grandma, and my cousins, I've seen him. He does it when my
> sisters are at school, and my grandma is at work. I've seen him
> freak [As.L.] and [An.L.], and clarified freak as in the butt.

*Id. at 129.*

During her physical examination of S.H., Dr. Taylor did not note any injuries. *Id. at 133*. However, Dr. Taylor collected a rape kit from S.H., because she had been

---

[11] At trial, Dr. Taylor testified that a penis could have caused the injury, but she acknowledged that some other body part or an "object" could also have caused it. *Id. at 127-128.*

at the home alone with Carter earlier that day while As.L. and An.L. were at school. *Id. at 129.*[12]

Dr. Taylor then interviewed An.L., who told her:

> Stan put lotion on him and me. He put his private part in my butt. It hurt when he did it . . . it happened more than once, and it was always in the butt.

*Id. at 133-134.*

During her physical examination of An.L., Dr. Taylor did not note any injuries. *Id.* Dr. Taylor did not collect a rape kit from An.L. because she could not determine her last sexual contact with Carter.

At trial, As.L. testified that, more than once while she lived with her grandmother and Carter in West Memphis, Carter touched her chest, "middle part," and "booty" with his hand and his "middle part".[13] *Doc. 13-4 at 99-100.* She said Carter played a movie of people "freaking" and told her to watch it. *Id. at 110-111.*[14] She further testified that, more than once, Carter put his "middle part" in her mouth and "white stuff" came out into her mouth:

---

[12] Dr. Taylor collected vulvar swabs and S.H.'s underwear for DNA analysis. *Id. at 132-133.*

[13] As.L. was 10 years old when she testified at Carter's trial.

[14] During their trial testimony, both As.L. and S.H. used the term "freaking" to connote sexual intercourse or some other form of sexual activity. None of the girls explained what "freak" or "freaking" meant, although it is clear from the context in which they used those terms that it meant some form of sexual activity.

PROSECUTOR: Did he touch you anywhere else with his middle part?
AS.L.: Yes.

PROSECUTOR: Where?
AS.L.: My mouth.

PROSECUTOR: What did he do with his middle part?
AS.L.: He put it in my mouth.

PROSECUTOR: Did that happen once, or more than once?
AS.L.: More than once.
. . .

PROSECUTOR: Where were you when that happened?
AS.L.: In the dining room.

PROSECUTOR: At your house in West Memphis?
AS.L.: Yes, sir.

PROSECUTOR: Was anybody else there?
AS.L.: No, sir.

PROSECUTOR: You and Stan were by yourself?
AS.L.: Yes, sir.

PROSECUTOR: Did anything come out of his middle part?
AS.L.: Yes, sir.

PROSECUTOR: What came out?
AS.L.: White stuff.

PROSECUTOR: Where did it go?
AS.L.: In my mouth.

*Id. at 101-102*.

Finally, As.L. testified that she saw Carter touch An.L.'s mouth and S.H.'s mouth with his "middle part" more than once:

PROSECUTOR: Have you seen Stan touch somebody else with his middle part?
AS.L.: (Nods head)

PROSECUTOR: Who did you see him touch?
AS.L.: My sister, and my cousin.

PROSECUTOR: What's your sister's name?
AS.L.: [An.L.]

PROSECUTOR: And what did you see him do to her?
AS.L.: [An.L.] – I really don't remember.

PROSECUTOR: Did you see him with his middle touch part [sic] touch [An.L.]?
AS.L.: Yes.

PROSECUTOR: Where did he touch her?
AS.L.: In her mouth.

PROSECUTOR: Did you see that once, or more than once?
AS.L.: More than once.

PROSECUTOR: Did you see him touch [S.H.]?
AS.L.: Yes.

PROSECUTOR: Where did he touch [S.H.]?
AS.L.: In her mouth too.

PROSECUTOR: Would anything happen with his middle part when he did that?
AS.L.: I don't know.

PROSECUTOR: Were there any grownups around the house when you would see that?
AS. L.: (Shakes head)
. . .

PROSECUTOR: When you lived in West Memphis, were there any other boys or men that lived in the house other than Stan?
AS.L.: No, sir.

*Id. at 102-103.*

According to As.L., the sexual contact with Carter occurred while her grandmother, Ms. Smith, was at work. *Doc. 13-4 at 106*. When asked why she did not tell her grandmother, As.L. said that Carter "told us to not tell grandma or nobody else." *Id. at 104*.

During her testimony, An.L. referred to Carter by his first name, "Stan."[15] *Doc. 13-4 at 87*. She testified that, when she lived with him, Stan touched her "middle part" and "behind" with his hand, more than once, but that he did not touch her anywhere else. *Id. at 88*. She recalled As.L. and S.H. being present when Stan had this sexual contact, but said no grownups were present. *Id. at 88-89*. An.L. further testified:

> PROSECUTOR: Have you ever seen Stan's middle part or private part?
> AN.L.: (SHRUGS SHOULDERS) I don't know.
>
> PROSECUTOR: You don't know what it looks like?
> AN.L.: I don't remember.

*Id. at 89*.

S.H. testified that her "granddaddy," who she went on to identify as "Stan," touched her "private parts" with his hand and "freaked" her:[16]

---

[15] An.L. was nine years old when she testified at Carter's trial.

[16] S.H. was seven years old when she testified at Carter's trial. After testifying that her "granddaddy" gave her a "bad touch," the prosecutor asked her: "Your granddaddy. What's his name?" S.H. answered: "Stan." Carter was the only man living in the residence with S.H. at the

PROSECUTOR: Who gave you a bad touch?
S.H.: (No audible response)

PROSECUTOR: Do you remember?
S.H.: (Nods head) My granddaddy.

PROSECUTOR: Your granddaddy. What's his name?
S.H.: Stan.
. . .

PROSECUTOR: Can you tell . . . what he touched your private part with?
S.H.: His hand.

PROSECUTOR: His hand. And did he touch you with anything else?
S.H.: Lotion.
. . .

S.H.: He had put it on him.
. . .

PROSECUTOR: Where did he put it?
. . .

S.H.: On his private part.

PROSECUTOR: Did he put lotion on you?
S.H.: (Nods head)

PROSECUTOR: Where did he put it?
S.H.: On my private part.

PROSECUTOR: And then what happened?
S.H.: He freakted [sic] me.

PROSECUTOR: And he freaked you. Has this just happened once?
S.H.: (Shakes head) A whole bunch of times.

---

time she was raped and sexually abused, and his first name is "Stan." This left little room for doubt that the man S.H. sometimes identified in her testimony as "granddaddy" or "granddaddy Stan" was, in fact, the defendant, Stan Carter.

PROSECUTOR: A whole bunch of times. Did he touch you anywhere else with his private part?
S.H.: Uh-huh, my mouth.
. . .

PROSECUTOR: Did he put his private part in your mouth?
S.H.: (Nods head)

PROSECUTOR: You'll have to answer.
S.H.: Yes, sir.

PROSECUTOR: Did that happen once, or more than once?
S.H.: More than once. More than once.

*Doc 13-4 at 61-66.* The prosecutor asked S.H., "Did you ever see anything come out of his private part?" S.H. answered, "Yes. . . . [w]hite stuff." *Id. at 68.* S.H. said that Stan abused her when her grandmother was outside and As.L. and An.L. were at a friend's house. *Id. at 67-68.* Finally, S.H. testified that she also saw Stan "freak" As.L. and An.L. more than once. *Id. at 68.*

After court adjourned on the second day of the trial, Carter drove to Grand Rapids, Michigan, "to see my kids or grandkids again." *Doc. 13-5 at 8-9.* When Carter's absence from court was brought to the attention of the trial judge, at the beginning of the third day of trial, he allowed the trial to proceed without Carter in attendance. *See* Ark. Code Ann. § 16-89-103(a)(2) (allowing a trial to go forward

without the defendant when the defendant is present for the beginning of trial but later causes himself to be unable to appear).[17]

After the state rested its case, Mr. Hair unsuccessfully moved for a directed verdict. With his client no longer in the courtroom, Mr. Hair was forced to make a tactical decision on whether to call the four character witnesses he had subpoenaed – all of whom were present to testify. In deciding *not* to call those witnesses, Mr. Hair requested and was granted permission to make a statement, on the record and outside the presence of the jury, explaining his tactical reason for doing so:

> MR. HAIR: Based on consulting with Mr. Carter, he had requested that I subpoena on his behalf a [J]uanita Duckworth Robinson, Michael Williams, Mr. Andrew Williams and Ms. Sharon Williams[18] *all of whom did come to court this morning.* The anticipated testimony from those witnesses would be that

---

[17] At Carter's sentencing hearing, he offered the following explanation for leaving the courtroom and the state after the second day of his trial:

> Mr. Hair informed me on the second day of trial when he went out and none of my witnesses was out there [*which is irrelevant because the prosecution had not yet rested its case*], he told me that, Mr. Carter, take care of whatever you have to take care of today because when you come to court tomorrow you probably won't be goin' home so I didn't know when I'd see my kids or grandkids again. I went to Grand Rapids. I seen my kids. I turned myself in the next day at the Grand Rapids police department.

*Doc. 13-5 at 8-9.* The trial judge responded: "If you needed to say goodbye to your family, the time to do that was before the trial not during it. . . . [a]nd you had people here ready to testify on your behalf the day you chose to run away. . . . They [Carter's witnesses whom Mr. Hair subpoenaed to testify] were certainly here during the trial, . . . during the day when . . . your case would have been put on." *Doc. 13-5 at 19-20.*

[18] Mr. Hair also identified these four individuals as potential defense witnesses on the first day of trial, during *voir dire. Doc. 13-3 at 30.*

they were familiar with Mr. Carter, and that the allegations made against him are inconsistent with their assessment of his character as they have observed it over the past months and years.

*However, based on Mr. Carter's absence from the court, all four witnesses stated that they were uncomfortable testifying on his behalf and stated as such to me as his lawyer. And then based on their unwillingness at that point to testify, they've been released.*

THE COURT: And your inability to discuss it with your client [because Carter voluntarily elected not to attend the final day of his trial, and instead, drove to Michigan to visit with his children and grandchildren].

MR. HAIR: And my inability to – right.
. . .

There were several witnesses called by the State who I reserved the right to recall in my case in chief based – to save them – to have the option to discuss them with my client whether or not I would recall them. Based on my assessment of the case thus far and again my inability to discuss strategically with my client what he would like to do, I am not going to recall any of those witnesses . . . And the main reason why is I am unable to discuss with him whether or not he sees it as beneficial. I do not. I'm not waiving anything that I find to be beneficial. I don't see any use in it at this point but I can't consult with him about that decision because he's not here.
. . .

THE COURT: And [the State's witnesses], you have had opportunities to interview them prior to trial, and opportunities to cross-examine them earlier in the trial, is that correct?

MR. HAIR: Yes.

*Doc. 13-6 at 51-52* (emphasis added).

**B.** **Analysis of Carter's Ineffective Assistance of Counsel Claims Against Mr. Hair**

On April 7, 2016, the Arkansas Supreme Court entered its decision affirming Carter's convictions. Under Arkansas Supreme Court Rule 2-3, Carter had eighteen days to file a Petition for Rehearing.

In Mr. Short's April 14, 2016 letter to Carter, enclosing the Arkansas Supreme Court's decision affirming Carter's conviction, he stated that he would file a Petition for Rehearing on the state speedy trial claim, which was *the only ground for reversal* Carter raised in his direct appeal. *Doc. 8 at 28*. For unknown reasons, Mr. Short failed to do so, and the Arkansas Supreme Court entered its Mandate on April 26, 2016.[19] Carter had sixty days, from April 26, 2016, to file his Rule 37 Petition.

On July 7, 2016, in response to a letter from Carter inquiring about the status of his appeal, the Office of the Criminal Justice Coordinator for the Arkansas Supreme Court wrote Carter and advised him that Mr. Short did not file a petition for rehearing and Carter's "case is now considered closed[.]" *See* Letter from Criminal Justice Coordinator to Carter, *Doc. 8 at 30*. By the time Carter received this letter, it was too late for him to file a timely Rule 37 Petition.

According to Carter, by not filing the Petition for Rehearing, Mr. Short "abandoned" him. Carter argues this caused him to miss the deadline for filing his

---

[19] *See* Online Docket, *Carter v. State*, Ark. S. Ct. Case No. CR-14-5, accessible at https://caseinfo.aoc.arkansas.gov.

Rule 37 Petition, and forced him to assert his four ineffective assistance of counsel claims, for the first time, in this habeas action. Having been "abandoned" by Mr. Short, Carter contends the "cause and prejudice" exception excuses his procedural default, consistent with the Court's holding in *Maples v. Thomas*, 565 U.S. 266 (2012).[20]

---

[20] In *Maples*, two pro bono lawyers from an out of state law firm represented the petitioner in his Alabama postconviction proceeding. After filing the state postconviction petition, both lawyers left the law firm for new employment, without notifying Maples or the trial court of their departure. *Id*. at 271. Later, the trial court denied the postconviction petition and sent separate copies of his decision to the two lawyers at their former law firm where the trial judge still understood they worked. The law firm returned both pieces of mail to the trial court, without either being opened. *Id*. The trial court never attempted any further mailing. *Id*.

After the deadline for appealing the trial court's denial of postconviction relief had expired, an Alabama Assistant Attorney General sent a letter directly to Maples informing him the trial court's denial was now final. *Id*. at 277.

Maples retained new lawyers who requested permission to appeal the trial court's denial of postconviction relief despite missing the original deadline. That request was denied. *Id*. at 278. Maples then sought federal habeas relief. *Id*. Both the district court and the Eleventh Circuit denied Maples's petition based on the procedural default. *Id*. at 279.

The Supreme Court reversed and remanded, finding cause to excuse Maples' procedural default because the attorney representing the petitioner abandoned him without notice, and thereby created the default. *Id*. at 281-283. In doing so, the Court distinguished attorney abandonment, which satisfies the "cause" requirement, from attorney negligence, which does not. *Id*. at 280. The Court reasoned that, in abandoning the petitioner, the attorney severed the principal-agent relationship and no longer served as the client's representative, so the attorney's error was not attributable to the former client:

> We agree that, under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him. Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him.

*Id*. at 283.

Rather than engaging in a complex legal analysis of whether Carter has procedurally defaulted his ineffective assistance of counsel claims, the Court concludes it is more efficient to analyze and reject each of those claims on the merits.[21]

### Claim 1: Ineffective Assistance of Counsel Based On Mr. Hair's Failure to Call Witnesses[22]

According to Carter, Mr. Hair failed to "properly subpoena, interview and/or retain witnesses who were ready to testify on behalf of Mr. Carter's good character . . . includ[ing] but not limited to [Andrew and Sharron Williams], Michael Williams, [J]uanita Robinson[,] . . . and Samantha Smith." *Doc. 8 at 17.* Additionally, he

---

[21] *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Trussell v. Bowersox*, 447 F.3d 588, 590-591 (8th Cir. 2006) (because neither the statute of limitations nor procedural default presents a jurisdictional bar to federal habeas review, both issues can be bypassed "in the interest of judicial economy"); *Kemp v. Hobbs*, 2012 WL 2505229 (E.D. Ark. June 28, 2012) (citing 28 U.S.C. § 2254(b)(2) and *McKinnon v. Lockhart*, 921 F.2d 830, 833 n. 7 (8th Cir. 1990)) ("Where it is more efficient to do so, therefore, this Court may resolve [habeas] claims on the merits rather than navigating through a procedural-default thicket.").

[22] In analyzing the merits of Claims 1 through 4, the Court must consider and answer two questions: *first*, was Mr. Hair's conduct professionally unreasonable under the circumstances; and *second*, did Mr. Hair's conduct prejudice Carter's defense. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An attorney's performance is deficient when it falls below "an objective standard of reasonableness." *Id.* The defendant is prejudiced by the inferior performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A habeas petitioner's failure "to establish either *Strickland* prong is fatal to an ineffective-assistance claim." *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011).

asserts that Juanita Robinson and Samantha Smith could have provided him with an alibi, by testifying that he was "[n]ever alone" with the children. *Id. at 17, 22*.

Under *Strickland*, 466 U.S. at 691, defense counsel has an affirmative duty to investigate the case and make reasonable decisions in preparing for trial. However, ineffective assistance of counsel claims, based on complaints of uncalled witnesses, are not favored because: "[1] the presentation of testimonial evidence is a matter of trial strategy[;] and [2] allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). Indeed, defense counsel's reasoned decision not to call a witness is a "virtually unchallengeable decision of trial strategy." *United States v. Orr*, 636 F.3d 944, 955 (8th Cir. 2011) (internal quotations omitted); *Rodela-Aguilar v. United States*, 596 F.3d 457, 464 (8th Cir. 2010) (explaining "there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences.") (internal quotations omitted).

Finally, to establish *Strickland* "prejudice", based on defense counsel's failure to investigate and call a potential witness, a habeas petitioner "must show that the witness would have testified and that their testimony 'would have probably changed the outcome of the trial.'" *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996) (quoting *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir.1994)).

### a. Mr. Hair's Decision Not To Call Any "Character Witnesses"

Carter contends that, on the third and final day of his trial, Mr. Hair should have called Andrew Williams, Sharron Williams, Michael Williams, Juanita Robinson, and Samantha Smith to testify about his good character. However, apart from making a series of entirely conclusory and factually unsupported assertions, Carter has done nothing to show how Mr. Hair's decision not to call those witnesses was deficient.

Importantly, four of those witnesses – Andrew Williams, Sharron Williams, Michael Williams, and Juanita Robinson – appeared in court and were prepared to testify, pursuant to subpoenas issued by Mr. Hair. Carter's unexplained absence from the courtroom caused all four of them to advise Mr. Hair that they were now unwilling to testify. *Doc. 13-6 at 51-52*.

If Mr. Hair had called those now reluctant witnesses, it is possible they might have become "hostile" and offer testimony harmful to Carter. Additionally, if Mr. Hair had called these witnesses, it would have opened the door for the prosecutor to cross-examine them about Carter's prior criminal history.[23] Ark. R. Evid. 404(a);

---

[23] During the sentencing hearing, the prosecutor effectively questioned Walter Baker, a character witness, about his knowledge of Carter's prior drug charges; his convictions for burglary, theft of property, breaking and entering, and commercial burglary; and a parole violation that resulted in a six-year term of imprisonment in the ADC. *Doc. 13-5 at 6-7*.

*Frye v. State*, 2009 Ark. 110, 10, 313 S.W.3d 10, 16 (2009) (When a defendant produces a character witness, the defendant opens the door to evidence that might otherwise be inadmissible, including inquiry on cross-examination into relevant specific instances of conduct.).

In their affidavits filed in support of Carter's habeas papers, Anthony Williams, Sharron Williams, and Juanita Robinson all claim that Mr. Hair never spoke with them prior to trial.[24] *Doc. 8 at 38-39* and *Doc. 18 at 4-5*. However, none of them *dispute* being present in the courthouse on the final day of Carter's trial, pursuant to subpoenas issued by Mr. Hair. Furthermore, their contention that Mr. Hair did not interview them prior to trial in no way undermines the following *uncontroverted facts*: (1) Mr. Hair subpoenaed Juanita Robinson, Michael Williams, Andrew Williams, and Sharon Williams to testify at Carter's trial; (2) all four of them appeared on the third and final day of the trial; (3) Mr. Hair believed when he subpoenaed them that they all would provide favorable testimony about Carter's good character; and (4) after they learned that Carter was not present in the courtroom, they expressed an unwillingness to testify, which required Mr. Hair to make the tactical decision not to call them as witnesses.

---

[24] Carter provided no affidavits from Samantha Smith and Michael Williams, the other two witnesses he contends Mr. Hair should have called to testify.

It was Carter's own actions, in leaving the state and not being present in the courtroom on the last day of his trial, that caused him to be "hoist on his own petard" with regard to the planned testimony of his character witnesses. Given those circumstances, which were beyond Mr. Hair's control, he made a reasonable tactical decision not to call any character witnesses.

Apart from not demonstrating any deficient performance by Mr. Hair, Carter also has not shown how he was "prejudiced" under the second prong of *Strickland*. To do so, Carter would have to demonstrate that the testimony of those witnesses "would have probably changed the outcome at trial." *Siers v. Weber*, 259 F.3d 969, 974 (8th Cir. 2001). Carter has presented no evidence to meet his burden of establishing *Strickland* prejudice.

### b. Mr. Hair's Alleged Failure to Call Juanita Robinson and Samantha Smith to Establish That Carter "Lacked the Opportunity" to Rape the Three Victims.

According to Carter, Ms. Robinson and Ms. Smith[25] would have testified that he was *never alone* with the girls. *Doc. 8 at 22*. Carter claims that Ms. Smith was present in the home before the girls went to school and Juanita Robinson was there when Carter brought them home from school. *Id.*

---

[25] During the relevant time period, Ms. Smith was the girls' primary caretaker and their "grandmother." She lived in the same home with the three girls and Carter. Neither side subpoenaed her as a witness and it is unclear whether she even attended the trial. *Doc. 13-3 at 29-30*. After Carter's arrest, As.L. and An.L. moved to Wisconsin to live with their father and S.H. moved in with her other grandmother. *Doc. 13-4 at 71, 82, and 94*.

Carter's habeas papers include an Affidavit from Ms. Robinson, which states that she shared a bedroom with the girls while recuperating from a car accident "around the year of 2011 and 2012." *Doc. 18 at 4-5*. She further states: "I was there when Stan had to pick up the kids from school" and "used to talk and hang out with my nieces [As.L. and An.L] a lot and they never looked as if anything bad was going on wrong with them." *Id*. These vague hearsay statements by Ms. Robinson neither provide Carter with an alibi nor constitute admissible evidence that Carter did not rape the three victims.

While Carter claims that Mr. Hair also should have subpoenaed and called Ms. Smith to testify, any testimony from her that Carter was *never alone* with the girls would have been in direct conflict with uncontroverted evidence in the record that Carter was *often* alone with the girls.[26] After all, Ms. Smith worked and was *not* home during the day, which would make it difficult for her to offer any credible testimony about how much time Carter spent alone with her granddaughters.

Suffice it to say, Carter has not demonstrated a reasonable probability that witnesses existed to prove he lacked the opportunity to rape the three victims.

---

[26] Indeed, on May 23, 2012, the afternoon Detectives Sammis and Peeler went to the home to investigate the alleged abuse, Carter was the only one there with the victims. Ms. Smith was at work. *Doc. 13-4 at 137*.

Likewise, Carter has presented no evidence that, if Ms. Robinson and Ms. Smith had testified, the outcome of his trial would have been different.

Accordingly, Claim 1 fails on the merits and must be dismissed, with prejudice.

### Claim 2: Ineffective Assistance of Counsel Based on Mr. Hair's Failure to Request a Continuance or Otherwise Object to the Amended Criminal Information

The initial criminal information charged that "on or about May 23, 2012," Carter "did unlawfully engage in sexual intercourse or deviate sexual activity with three other persons, females, one six (6) year old, one eight (8) year old and one nine (9) year old." *Doc. 13-2 at 20-21*.[27] *Doc. 13-2 at 20-22*. On the morning before Carter's trial, the prosecutor amended the criminal information to state that the rapes took place between "January 1, 2011 through May 24, 2012." *Id. at 18-19*.

Carter claims Mr. Hair provided ineffective assistance of counsel by failing to move for a continuance or seek a bill of particulars based on the amended criminal information:

> Here the state originally charged Petitioner with three (3) rape offenses against three (3) separate females alleging all occurred on May 23, 2012. For over a year Petitioner did focus and prepare for this. Then, on the eve of trial, without objection of trial counsel, the state filed an amended information alleging three (3) rapes against three (3) females to have occurred January 1, 2011, through May 24, 2012 . . . any reasonable

---

[27] "Deviate sexual activity" is defined in Ark. Code Ann. § 5-14-101. As applied to Carter, § 5-14-103(a)(3)(A) states that "a person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person . . . who is less than fourteen years of age."

acting attorney would have objected to the late amendment, requesting a bill of particulars and made record of the obscurity in the charging instrument.

*Petitioner, actually, was aware of the specifics alleged against him*. The mere citation of a statute without further explanation just didn't provide enough information in order for petitioner to adequately prepare for such an advers[ar]ial test of the State's case against him.

*Doc. 8 at 18* (emphasis added).

While the sufficiency of a state charging instrument is primarily a question of state law, the Due Process Clause of the Fourteenth Amendment requires that a person receive fair and reasonable notice of the charges against him. *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000); *Wilkerson v. Wyick*, 806 F.2d 161, 164 (8th Cir. 1986); *see also Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir.1993) ("Sufficiency of a state charging instrument is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction over the case."); *Jones v. Bradshaw*, 2006 WL 2849766 (N.D.Ohio 2006) (on federal habeas review the "sole Constitutional issue is whether the indictment provides the defendant with sufficient information of the charged offense, to enable him to defend himself against the accusations.").

The original criminal information charged Carter with three counts of rape for engaging in sexual intercourse or deviate sexual activity with As.L., An.L., and S.H., "on or about May 23, 2012." There is no evidence that the prosecution's amendment

of the criminal information, the day before trial, to allege the rapes took place between "January 1, 2011 [and] May 24, 2012," prejudiced Carter's defense. Mr. Hair and Carter both knew, based on the *original* criminal information, that the three victims might testify that Carter sexually abused them *before* "on or about May 23, 2012," a date that initially was selected by the prosecutor because it was the day before law enforcement authorities learned that Carter was sexually abusing the three children.[28] The amended information merely clarified that the prosecutor believed the rapes were committed between January 1, 2011, and May 24, 2012, the approximate period of time Carter lived in the house and had the opportunity to be alone with the victims. *See Lee v. Gammon*, 222 F.3d at 441, 442-43 (8th Cir. 2000) (due process question is whether defendant "actually received notice of the crime of which he was convicted"); *Kilgore v. Bowersox*, 124 F.3d 985, 993 (8th Cir. 1997); *Cokeley v. Lockhart*, 951 F.2d 916, 918-20 (8th Cir. 1991).

---

[28] Under Arkansas law, "generally the time a crime is alleged to have occurred is not of critical significance unless the date is material to the offense." *Harris v. State*, 320 Ark. 677, 680, 899 S.W.2d 459, 461 (1995) (citing *Fry v. State*, 309 Ark. 316, 829 S.W.2d 415(1992)). "That is particularly true with sexual crimes against children and infants." *Id. See also*, *Rains v. State*, 329 Ark. 607, 953 S.W.2d 48 (1997) (citations omitted) (In the context of sexual abuse to a child, the government is not required "to prove specifically when and where each act of rape or sexual contact occurred, as time is not an essential element of the crimes.").

Similarly, the Eighth Circuit has determined that the date of an offense is not a material element of aggravated sexual assault when committed within the jurisdiction of the United States. *See United States v. Youngman*, 481 F.3d 1015 (8th Cir. 2007); s*ee also United States v. Agard*, 531 F. Supp. 2d 1072, 1074 (D.N.D. 2008) ("It is clear that time is . . . not a material element of the offense of sexual abuse of a minor.").

Carter does not explain why he needed additional time to prepare for trial, based on the amended criminal information, or explain how a continuance would have produced a different result. Carter's defense was that *he never raped the victims on any date*, regardless of whether it was May 23, 2012, or some other dates between January 1, 2011, and May 24, 2012. Based on these facts, the amended criminal information did not violate Carter's due process rights or otherwise provide Mr. Hair with any legal basis for seeking a continuance or a bill of particulars.

Accordingly, Claim 2 fails on the merits and must be dismissed, with prejudice.

### Claim 3: Ineffective Assistance of Counsel Based on Mr. Hair's Failure to Inform Carter of DNA Evidence and Obtain Independent Experts to Review the DNA Evidence[29]

Carter claims Mr. Hair provided ineffective assistance of counsel by "failing to timely inform [him] of and prepare him with exonerating DNA evidence," and not seeking an independent expert to review the DNA evidence. *Doc. 8 at 16-17*.

---

[29] In Carter's habeas papers, he appears to argue that both Mr. Hair *and* "the State" failed to "furnish [to Carter] the [DNA] materials necessary to conduct a fair trial." *Doc. 8 at 17*. As will be explained, any assertion that the prosecution failed to disclose the DNA evidence is conclusively refuted by Mr. Hair's effective use of that evidence during Carter's trial. *Morales v. Ault*, 476 F.3d 545, 555 (8th Cir. 2007) (citing *Brady v. Maryland*, 373 U.S. 83 (1963) (*Brady* requires a showing that the prosecution actually suppressed the evidence.)).

On the final day of trial, the prosecution called Christopher Glaze, a DNA Analyst with the Arkansas State Crime Laboratory.[30] Mr. Glaze testified that he initially compared the DNA material from S.H.'s vulvar swabs and underwear with the oral DNA swabs from Carter. Mr. Glaze found *no male DNA* on any of the samples taken from S.H.

According to Mr. Glaze, he then conducted a DNA "Y test" on S.H.'s underwear. *Doc. 13-6 at 27.*[31] After performing the DNA Y test, Mr. Glaze developed a *partial* Y profile and concluded that neither Carter nor any of his paternally-related male relatives could be "excluded" as a potential contributor of the partial Y profile developed from S.H.'s underwear. *Id. at 28-29.*

The trial record clearly demonstrates that Mr. Hair obtained and reviewed the DNA evidence prior to trial and adequately prepared his cross-examination of Mr. Glaze. *Doc. 13-6 at 31-46.* During his cross-examination, Mr. Hair used Mr. Glaze's reports, based on the standard DNA test and the DNA Y test, to establish that neither

---

[30] Forensic Serologist Stacie Wassell, with the Arkansas State Crime Lab, tested the samples from S.H. for the presence of semen. She also took tape-lifts from S.H.'s underwear. *Doc. 13-6 at 16.* Ms. Wassell's report, dated July 20, 2012, concluded that no sperm cells were present on any of the samples. However, she identified the presence of P-30, a component of semen, on S.H.'s underwear. *Id.* Ms. Wassell then prepared and sent those samples to Mr. Glaze for further DNA analysis. *Id. at 17.*

[31] Mr. Glaze explained that the DNA Y test is useful in cases where the sample contains a large amount of female DNA mixed with a very small amount of male DNA. He also testified that a standard DNA test may not identify the male DNA because it is masked by the volume of female DNA. *Id. at 27-28.*

test identified Carter as *the source* for the male DNA material. *Id. at 34-35*. Mr. Hair also cross-examined Mr. Glaze at length on the reliability of the database he used in developing the DNA Y profile.[32] Thus, Mr. Hair's cross-examination of Mr. Glaze effectively demonstrated that the DNA Y test, which resulted in a *partial* Y profile, was of questionable reliability and only served to identify Carter *and* any of his paternally-related male relatives as persons who could *not* be "excluded" as a potential contributor to the partial Y profile developed from S.H.'s underwear.

Given the favorable testimony from Mr. Glaze on cross-examination, there was no need for Mr. Hair to call an independent DNA expert. At most, such an expert would have identified the *same holes* in Mr. Glaze's DNA test results that *he freely admitted on cross-examination. See Battle v. Delo*, 19 F.3d 1547, 1557 (8th Cir. 1994), as modified on reconsideration, 64 F.3d 347, 353-354 (8th Cir. 1995) ("Trial counsel is not required to employ the services of experts, provided that counsel

---

[32] On direct examination, Mr. Glaze explained that the rarer the YSTR profile (the profile developed by isolating the Y chromosome), the more weight a consistent match may be given. *Doc. 13-6 at 30*. In determining the rareness of the partial profile he developed from S.H.'s underwear, Glaze searched an online database containing between 15,000 and 16,000 other YSTR profiles. *Id.* The partial profile from S.H. was not observed in any of the profiles in the database which contained the following demographic: 4,178 African-Americans; 852 Asians; 6,745 Caucasians; 3,106 Hispanics; and 910 Native Americans. *Id. at 30*.

On cross-examination, Mr. Glaze acknowledged that he only had a partial profile in this case, and, the fuller the Y profile is, the more accurate the test. *Id. at 42*. He also agreed that the DNA Y test could not include persons with scientific certainty. *Id. at 37-38*. Finally, Mr. Glaze agreed that the database would only be helpful to demonstrate rareness if the database included profiles from a broad range of geographic regions. *Id. at 40-42*. Mr. Glaze could not say where the profiles in the database came from, aside from noting that blood banks and volunteers provide the profiles from Florida, Wisconsin, and "a lot of different areas." *Id. at 43*.

prepares an adequate defense for a client through careful investigation of facts surrounding the case.").

Finally, "[a] claim of ineffective assistance based on the failure to consult and call an expert requires evidence of what a scientific expert would have stated at trial in order to establish *Strickland* prejudice." *Rodela-Aguilar v. United States*, 596 F.3d 457, 462 (8th Cir. 2010). Here, Carter does not explain how a defense DNA expert might have offered evidence to undermine the eye-witness testimony of As.L., S.H., and An.L. It was their strong and credible testimony, *not* the vague and equivocal DNA evidence, that resulted in Carter's convictions for raping each of them. Accordingly, Carter has failed to establish any prejudice, as required by *Strickland*.

While Carter alleges that Mr. Hair failed to inform him of the DNA evidence prior to trial, he does not explain how it resulted in any *Strickland* prejudice. Carter contends that, because none of the DNA evidence unequivocally identified him as *the source* for the male DNA present on S.H.'s underwear, it "exonerated him." On its face, Carter's argument is preposterous. The inconclusive DNA evidence in no way meant that Carter did not rape S.H.; and it had *no relevance whatsoever* to the question of whether he also raped As.L. and An.L.[33]

---

[33] At his sentencing hearing, Carter said: "I just found out this mornin[g] by Mr. Hair that the DNA didn't point directly to me. It had somethin[g] to do with someone in my family or close to my family. It didn't point exactly to me. I did not do this." *Doc. 13-5 at 9*. Of course, if Carter had elected to show up for the third and final day of his trial, he would have had the benefit of hearing Mr. Glaze's testimony, in which he acknowledged the weaknesses that linked Carter to the available DNA evidence. It might have also helped him to appreciate that it was *not* the DNA

As.L. testified that Carter penetrated her mouth and vagina with his penis more than once and that she watched him do the same to An.L. and S.H. numerous times. *Doc. 13-4 at 99-103*. S.H. also testified that Carter repeatedly had oral and vaginal sex with her. *Id. at 65-66*. An.L. testified that Carter touched her vagina and buttocks and that As.L. and S.H. were present when he did it. *Id. at 88-89*. Their testimony, *standing alone*, was sufficient to convict Carter, beyond a reasonable doubt, on all three counts. *See Small v. State*, 371 Ark. 244, 256 (2007) (*Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005) (DNA evidence unnecessary because "the uncorroborated testimony of a rape victim is sufficient to support a conviction if the testimony satisfies the statutory elements of rape")).

Carter has not demonstrated how the DNA evidence he complains about was even detrimental to his defense, much less how Mr. Hair's further development of that evidence might have had the potential to change the outcome of the trial.

Accordingly, Claim 3 fails on the merits and must be dismissed, with prejudice.

---

evidence that was his problem – it was the strong and credible testimony of the three young girls he raped, who each described in graphic detail what he did to them.

## Claim 4: Mr. Hair's Failure to Challenge the Sufficiency of the Evidence, on Direct Appeal, Constituted Ineffective Assistance of Counsel.

After the prosecution rested, Mr. Hair moved for a directed verdict based on insufficient evidence. *Doc. 13-6 at 46-47*.[34] Carter claims Mr. Hair provided ineffective assistance of counsel because he failed to raise the issue of the sufficiency of the evidence on direct appeal. *Doc. 8 at 18-19*. For the reasons explained below, this claim fails on the merits.

Under Arkansas law, rape is defined to include "engag[ing] in sexual intercourse or deviate sexual activity with another person . . . [w]ho is less than fourteen (14) years of age." Ark. Code Ann. § 5-14-103(a)(3)(A) (emphasis added). "Deviate sexual activity" is defined as any act of sexual gratification involving the "penetration, however slight, of the anus or mouth of a person by the penis of another person" or the "penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person." Ark. Code Ann. § 5-14-101(1).

All three girls were children, well under fourteen years of age at the time of the charged conduct. As.L. testified that Carter orally penetrated her with his penis

---

[34] Mr. Hair argued: (1) the testimony from the girls was not credible or consistent; (2) there was no other eyewitness testimony; (3) the DNA tests were inconclusive, and the DNA Y test relied on a faulty database; and (4) Dr. Taylor found no injuries she could say for certain were the product of a sexual assault. The trial court denied the motion for directed verdict, concluding that As.L.'s testimony alone was sufficient for the case to go to the jury. *Doc. 13-6 at 48*.

more than once. She further testified that she saw him orally penetrate S.H. and An.L. *Doc. 13-4 at 99-103*. While As.L.'s trial testimony alone was more than sufficient to support Carter's convictions on all three counts of rape, there was additional consistent supporting testimony from S.H. and An.L. *Id. at 65-66, 88-89*. S.H. testified that Carter repeatedly raped her orally and vaginally, and An.L. testified that Carter touched her vagina and buttocks and that As.L. and S.H. were present when he did it. *See Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000) (citing *United States v. Wright*, 119 F.3d 630, 634 (8th Cir. 1997)) (A rape victim's testimony is, "by itself, normally sufficient to sustain a conviction."); *see also*, *United States v. Tillman*, 765 F.3d 831, 834 (8th Cir. 2014) (quoting *U.S. v. L.B.G.*, 131 F.3d 1276, 1278 (8th Cir. 2011) ("i[t] is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction.")). Thus, it would have been pointless and futile for Mr. Hair to challenge the sufficiency of the evidence on direct appeal.[35]

---

[35] There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Charboneau v. United State*s, 702 F.3d 1132, 1136-37 (8th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). The Court must be "particularly deferential when reviewing a claim that appellate counsel failed to raise an additional issue on direct appeal." *Charboneau*, 702 F.3d at 1136. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal," *U.S. v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Thus, "absent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Brown*, 528 F.3d at 1033.

Finally, it was Mr. Short, *not* Mr. Hair, who filed Carter's Appellant's Brief and represented Carter in his direct appeal. Carter does *not* assert an ineffective assistance of counsel claim against Mr. Short for *his decision* not to challenge the sufficiency of the evidence in Carter's direct appeal. *Doc. 8 at 18-19*.

Accordingly, Claim 4 fails on the merits and must be dismissed, with prejudice.

## C. Carter's Claim That His Convictions Must Be Vacated Based on a Violation of Arkansas' Speedy Trial Rule (Claim 5)

Carter contends that, because the trial court "did not follow the strict requirements of Arkansas Rule of Criminal Procedure 28.3," his convictions should be vacated. *Doc. 2 at 2*. Respondent correctly argues that this claim, which is based on an alleged violation of state law, is not cognizable in a federal habeas action.

An alleged violation of Arkansas's speedy trial rule is *not* cognizable in a § 2254 habeas action because "taken alone, [it] does not present a federal claim reviewable on a habeas petition." *See Poe v. Caspari*, 39 F.3d 204, 207 (8th Cir. 1994). Accord: *Allen v. Department of Corrections*, 288 Fed. Appx. 643, 644-45 (11th Cir. 2008) (district court did not err in failing to address speedy-trial claim premised on violation of state speedy trial that made "no mention of a federal constitutional speedy trial violation"); *Zerla v. Leonard*, 37 Fed. Appx. 130, *1 (6th Cir. 2002) (rejecting petitioner's claim that his federal constitutional rights had been violated based on a violation of a state-law speedy-trial rule – "Federal habeas corpus relief is not available on the basis of alleged violations of state law, but is confined to arguments raising violations of the Constitution."); *Hilgert v. Stotts*, 36 Fed. Appx. 348, 350 (10th Cir. 2002) (declining to issue certificate of appealability of the district court's rejection of a speedy-trial claim based on a violation of state law –

"state-court determinations of state-law claims will not be examined in federal habeas proceedings"); *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997) (habeas petitioner who presented a "thorough and lengthy argument on the alleged violation of his right under state law to a speedy trial" in state court did not properly present claim that he was denied his federal constitutional right to a speedy trial).

Accordingly, Claim 5 fails on the merits and must be dismissed, with prejudice.

### D. Carter's Claim That His Convictions Must Be Vacated Based on a Violation of His Constitutional Right to a Speedy Trial (Claim 6)

In his habeas papers, Carter asserts, *for the first time*, that his *federal* constitutional right to a speedy trial was violated.[36] *Doc. 2 at 4*. Respondent argues that this claim is barred by the doctrine of procedural default.

To avoid a procedural default, a habeas petitioner must demonstrate that he first fairly presented his constitutional claim to the state court, *i.e.*, he must "present the same facts and legal theories to the state court that he later presents to the federal courts." *Morris v. Norris*, 83 F.3d 268, 270 (8th Cir. 1996) (quoting *Jones v. Jerrison*, 20 F.3d 849, 854 (8th Cir. 1994)). To satisfy the "fair presentation" requirement, a habeas petitioner must raise and point the state court to "a specific

---

[36] The right to a speedy trial is guaranteed by the Sixth Amendment to the Constitution, which extends to state criminal defendants under the Due Process Clause of the Fourteenth Amendment. *Barker v. Wingo*, 407 U.S. 514, 515 (1972).

federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Ford v. Norris*, 364 F.3d 916, 921 (8th Cir. 2004) (citation omitted). This means that Carter must demonstrate that he raised his Fourteenth Amendment *federal* speedy trial claim with the trial court and then appealed the denial of that claim to the Arkansas Supreme Court in his direct appeal. *See Meek v. State*, 2013 Ark. 314, at 3 (allegations of violations of a defendant's speedy-trial rights constitute a trial court error that must be raised on direct appeal and are *not* cognizable in a Rule 37 petition). Only after doing so can Carter properly pursue his federal speedy trial claim in this § 2254 action.

Carter *admits* that he raised only a *state speedy trial claim* in the motion to dismiss he filed with the trial court. The trial court's alleged error in denying that motion was Carter's *only argument* in his direct appeal to the Arkansas Supreme Court. Even though he acknowledges he never raised a federal speedy trial claim in his state court proceedings, he argues that "referring to the applicable state speedy trial rules is sufficient because Rule 28 [of the Arkansas Rules of Criminal Procedure] was adopted for the purpose of enforcing the constitutional provision requiring a speedy trial." *Doc. 16 at 2-4.* As legal support for his position, Carter

cites *Cox v. Lockhart*, 970 F.2d 448 (8th Cir. 1992).[37] Suffice it to say, in making

this argument, Carter demonstrates no understanding of the controlling Eighth

Circuit case law on procedural default. *Ford*, 364 F.3d at 921.

Carter unquestionably has procedurally defaulted his federal speedy trial

claim. Before the Court can reach and decide such a claim, Carter must establish

either "cause and prejudice" or "actual innocence" as equitable grounds to excuse

his procedural default.[38]

---

[37] Carter relies on footnote 5 in *Cox* as if it represents a controlling rule of law. It does not. Rather, in the footnote, the Court quotes the *petitioner-appellant's argument*:

> In his brief, appellant states:
>
> The *only question* here relates to the *legal basis* for the argument, *i.e.*, whether it was based upon the state speedy trial rules or the federal Sixth Amendment speedy trial guarantee. We acknowledge that Cox's Rule 37 [state] petition does not contain a reference to the latter of these. However, referring to the applicable state speedy trial rules (Ark. R. Crim. P. 28 et seq.) is sufficient because "[r]ule 28 was adopted for the purpose of enforcing the constitutional provisions requiring a speedy trial." [citations omitted]. In light of this, it should be held that reference to Ark. R. Crim. P. 28 is clearly an implied reference to the Sixth Amendment speedy trial guarantee.

*Cox v. Lockhart*, 970 F.2d 448, fn. 5 (8th Cir. 1992) (emphasis in original). The Court went on to explicitly *reject* Cox's argument, holding "[a] fair presentation of appellant's current Sixth Amendment speedy trial claim would have required a much broader factual and legal presentation" than Cox's argument in the state court that "focused upon the calculation of certain time periods and whether defendant requested or was responsible for certain delays." *Id. at 454.*

[38] Federal review of a procedurally defaulted habeas claim is barred unless the petitioner can demonstrate "cause" for the default *and* "actual prejudice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Alternatively, a habeas petitioner can also save such a procedurally defaulted claim if he can demonstrate that a constitutional violation "has probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### 1. Cause and Prejudice

As cause for the default, Carter offers only one justification: Mr. Short, the attorney who represented him on direct appeal, "abandoned" him seven days *after* the Arkansas Supreme Court affirmed Carter's convictions. *Doc. 8 at 4*. According to Carter, Mr. Short sent him a letter, dated April 14, 2016, in which he unequivocally stated that he *would file* a petition for rehearing on the state speedy trial issue, something he later failed to do. The record is *silent* on *why* Mr. Short did *not* file the petition for rehearing, or have any further contact with Mr. Carter about the status of his appeal.

If Mr. Short's failure to act was the result of "negligence," it does *not* constitute "cause" sufficient to excuse Carter's failure to file a timely Rule 37 Petition raising his ineffective assistance of counsel claims. Only if Mr. Short did not file the petition for rehearing, because he "abandoned" his representation of Carter, can it constitute "cause" to excuse Carter's procedural default. *See Maples,* 565 U.S. at 280-281, 283.[39]

Given the completely undeveloped record regarding Mr. Short's reasons for not filing the petition for rehearing, the Court is in no position to decide, under

---

[39] Carter also cites *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013), to support his claim that this Court should excuse his procedural default. Because the *Martinez* and *Trevino* exception does *not* extend to claims of *trial error* (such as Carter's speedy trial claim), those decisions have no application to the facts in this case. *See Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014).

*Maples*, if there is cause for excusing Carter's procedural default of his ineffective assistance of counsel claims. However, there is a far more obvious and fundamental legal problem with Carter's argument that makes this case factually distinguishable from *Maples*, and deprives Carter of a legal basis for claiming his procedural default should be excused under the "cause and prejudice" exception.

A speedy trial violation is an error that must be raised with the trial court and then reasserted on direct appeal. *Meek*, 2013 Ark. 314 at 3. That means Carter was required to raise both his state *and* federal speedy trial claims with the trial court and then, after those claims were denied, to raise them again in his direct appeal to the Arkansas Supreme Court.

Here, Carter's trial counsel, Mr. Hair, raised the state speedy trial claim with the trial court but *not* the federal speedy trial claim. Thus, when Mr. Short inherited Carter's case on appeal, the federal speedy trial claim had already been procedurally defaulted and he could *not* raise it on direct appeal. As a result, even if Mr. Short had filed the petition for rehearing, it would have been limited to requesting the Arkansas Supreme Court to reconsider its denial of the state speedy trial claim. Accordingly, regardless of Mr. Short's reason for not filing the petition for rehearing, it did not result in Carter's procedural default of the federal speedy trial claim. Nothing in *Maples* authorizes this Court to find that Mr. Short's failure to file

the petition for rehearing is "cause" for excusing *Mr. Hair's* failure to raise and preserve the federal speedy trial claim during Carter's trial.[40]

The only remaining ground for saving Carter's procedurally defaulted federal speedy trial claim is that this Court's failure to consider it would result in a "fundamental miscarriage of justice," *i.e.*, the alleged constitutional error probably resulted in the conviction of an innocent person. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *accord House v. Bell*, 547 U.S. 518 (2006).

## 2. Carter's Gateway Claim of Actual Innocence

Carter asserts that he is "actually innocent", as a gateway to excuse the procedural default of his federal speedy trial claim. *Doc. 2 at 4, Doc. 8 at 20-24*. For the reasons discussed below, the Court concludes that Carter's gateway claim of actual innocence is without merit.

In *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), the Court explained that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." The Court went on to "caution, however, that tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence,

---

[40] Because Carter has not demonstrated "cause" to excuse his procedural default, the Court need not address whether there was any "actual prejudice" as a result of the alleged violation of federal law. *McCleskey v. Zant*, 499 U.S. 467, 602 (1991).

no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)) (internal quotations and alterations omitted). The actual-innocence exception requires a habeas petitioner to come forward with "new reliable evidence" which was "not available at trial through the exercise of due diligence." *Schlup*, 513 U.S. at 324.

In his Affidavit filed in support of his habeas claims, Carter asserts that the three victims "framed him" because he disciplined As.L. and An.L. around the time of his arrest:

> [t]hat between the date(s) of January 1, 2011 through May 24, 2012 I did not perform any sexual intercourse and/or perform any type of deviate sexual acts on [S.H.], [An.L.] and [As.L.], that those allegations were not true. . . . I disciplined [An.L.]. . . . I spanked [An.L.] for lying and acting up . . . the same day, [As.L] received a spanking for constantly acting up during the night when they had been put to bed.

*Doc. 8 at 36-37*. Carter's factual assertions that "corporal punishment" led the victims to falsely accuse him of rape could have been presented during the trial, and do *not* constitute "new evidence." *Schlup*, 513 U.S. at 324.

Carter also now attempts to rely on the following hearsay statements in Juanita Robinson's Affidavit, dated April 5, 2018: "I have been around my nieces since then and they are saying that Stanley never touched them in the wrong way." *Doc. 18 at 4-5*. This vague and indefinite statement does *not* constitute "new reliable evidence" capable of supporting an actual innocence claim.

Courts look upon recantations with suspicion. *United States v. Waters*, 194 F.3d 926, 933 (8th Cir. 1999); *United States v. Miner*, 131 F.3d 1271, 1273-74 (8th Cir. 1997); *United States v. Provost*, 969 F.2d 617, 619-20 (8th Cir. 1992). "[S]kepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon" such as "when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story." *Miner*, 131 F.3d at 1273-1274 (quoting *Provost*, 969 F.2d at 621). *See also*, *State v. Cain*, 427 N.W.2d 5, 8 (Minn.Ct.App. 1988) (noting recantation is "frequent characteristic of child abuse victims"); *State v. Gallagher*, 150 Vt. 341, 350, 554 A.2d 221, 225 (1988) (citing *Johnson v. State*, 292 Ark. 632, 643-44, 732 S.W.2d 817, 823 (1987) (observing the "high probability of a child victim recanting a statement about being sexually abused")). Additionally, "[t]he stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at trial." *United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997).

Here, Ms. Robinson's hearsay assertions that one or more of her nieces (the victims) allegedly told her that "Stanley never touched them in the wrong way" fall well short of the kind of sworn recantation testimony, *from an actual victim*, that

*might* be deemed to constitute "new reliable evidence" of actual innocence.[41] Nothing about the purported hearsay statements of the victims, as filtered through the lens of Ms. Robinson's Affidavit, persuades the Court that Carter's conviction constituted a fundamental miscarriage of justice.

Accordingly, the Court concludes that Carter's gateway actual innocence claim is without merit and cannot serve as a basis for excusing his procedural default of the federal speedy trial claim he seeks to assert for the first time in this habeas action.

### III. Conclusion

IT IS THEREFORE ORDERED that this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus, *Doc. 2*, is DENIED and this case is DISMISSED, WITH PREJUDICE.

IT IS FURTHER ORDERED THAT a Certificate of Appealability is DENIED. *See* 28 U.S.C. § 2253(c)(1)-(2); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts.

---

[41] The "actual innocence" gateway exists "to avoid fundamental miscarriages of justice, not to provide the opportunity for fishing expeditions and delay or . . . a second trial." *Battle v. Delo*, 64 F.3d 347, 354 (8th Cir. 1995).

DATED THIS 26th day of March, 2019.

_____
UNITED STATES MAGISTRATE JUDGE